**WO**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Sharon Booth, | Case No. CIV-05-1249-PHX-SMM |
| Plaintiff, | |
| v. | **MEMORANDUM OF DECISION AND ORDER** |
| AT&T Long-Term Disability Plan, and Metropolitan Life Insurance Company, | |
| Defendants. | |

Before the Court are the parties' cross-motions for summary judgment (Dkts. 21, 37). Having reviewed the Administrative Record and parties' arguments, the Court now issues this Memorandum of Decision and Order.

## BACKGROUND

### A.  Factual Background

Plaintiff Sharon Booth ("Plaintiff") was employed with AT&T Corporation ("AT&T") as a Customer Care Associate.  Plaintiff's sedentary job involved receiving incoming calls from customers regarding telephone and internet service, and required use of a computer and headset.  (Dkt. 24, Defs.' Am. Statement of Facts ("DSOF") ¶¶ 1.) Plaintiff participated in AT&T's employee welfare benefits plan ("the Plan").  (DSOF ¶ 3.)

The Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  (DSOF ¶ 4.)  The Plan

is self-funded, with benefits paid by the AT&T Long Term Disability Plans Benefit Trust and AT&T.  (DSOF ¶ 5.)  The Plan provides that AT&T is the Plan Administrator, and Defendant Metropolitan Life Insurance Company ("MetLife") is the Claims Administrator.  (DSOF ¶ 7.)  The Plan grants MetLife "sole and complete discretionary authority to determine conclusively for all parties . . . any and all questions arising from:" administration of the Plan and interpretation of Plan provisions; determination of eligibility for benefits; determination of facts; determination of the amount and type of benefits; and construction of all terms of the Plan.  (Dkt. 53, ML-Booth 0955; DSOF, Ex. 2, ML-Booth 0998.)  The Plan includes short-term disability ("STD") and long-term disability ("LTD") benefits.  This dispute arises out of MetLife's termination of Plaintiff's LTD benefits.

## B.  Payment and Termination of STD Benefits

Plaintiff took a leave of absence beginning on March 7, 2000, one day before she underwent a total abdominal hysterectomy.  (DSOF ¶ 11-12.)  Plaintiff's application for STD benefits based on the hysterectomy was approved, with an estimated recovery period of four to six weeks.  (Dkt. 39, Pl.'s Statement of Facts ("PSOF"), Ex. 80, ML-Booth 0470.)  Plaintiff later informed AT&T that she could not return to work when anticipated because of back pain.  (DSOF ¶ 13.)  An MRI taken after the hysterectomy showed a herniated disc which Dr. Anthony Theiler recommended be treated with epidural steroid injections.  (DSOF, Ex. 6, ML-Booth 0840-0841.)  Dr. Theiler stated that Plaintiff was unable to perform her job duties secondary to pain, but expected improvement in pain and ability to work.  (Id. at 0841.)

Around June 15, 2000, Plaintiff underwent a microdiscectomy to repair the herniated disc.  (DSOF ¶ 15.)  Dr. Curtis Dickman performed the microdiscectomy.  (DSOF, Ex. 7, ML-Booth 0109-0111.)  At a two-month follow-up visit with Dr. Dickman, Plaintiff complained of a moderate amount of persistent postoperative back

pain and pain radiating into her buttocks.  Dr. Dickman reviewed an MRI and x-rays and noted degenerative narrowing of disc spaces, as well as central disc bulges.  Dr. Dickman did not find a recurrent disc herniation, and believed Plaintiff's ongoing symptoms were related to degenerative disc disease.  He recommended that Plaintiff begin a physiotherapy program to strengthen her abdominal and lumbar paraspinal muscles.  (DSOF, Ex. 8, ML-Booth 0099.)  Dr. Dickman stated that Plaintiff was presently unable to return to work, but anticipated improvement in one month with physical therapy.  (DSOF, Ex. 9, ML-Booth 0830.)

Dr. Robert Porter reviewed Plaintiff's medical information on behalf of MetLife in September 2000 and concluded that Plaintiff could "return to at least medium work duties."  (DSOF, Ex. 13, ML-Booth 0638.)  Dr. R. Kevin Smith reviewed Dr. Porter's assessment and agreed that "[Plaintiff] does not have objective evidence . . . which would preclude her from returning to her regular work on a full-time basis."  (DSOF, Ex. 14, ML-Booth 0596.)  MetLife notified Plaintiff that STD benefits would be denied effective October 2, 2000.  (PSOF, Ex. 80, ML-Booth 0489-0490.)  That denial was later overturned and Plaintiff was allowed to exhaust her STD benefits.  (Id. at 0492.)  Plaintiff exhausted her STD benefits on March 12, 2001.  (DSOF ¶ 24.)

**C. LTD Benefits and Related Medical History**

Plaintiff returned to Dr. Dickman in January 2001, complaining of continued back pain radiating into her buttocks.  (DSOF ¶ 25.)  Dr. Dickman's impression was that Plaintiff had severe incapacitating mechanical back pain and bilateral radicular pain symptoms, severe degenerative disc disease at L5-S1, and moderate degenerative disc disease at L4-5.  Dr. Dickman recommended that Plaintiff have a discography performed to determine the source of pain symptoms.  The results of the discography would indicate whether Plaintiff should undergo a lumbar interbody fusion.  (DSOF, Ex. 16, ML-Booth 0084-0085.)

Plaintiff returned to Dr. Dickman on March 9, 2001, to discuss the discography results. The L4-5 discogram was negative, and the L5-S1 discogram was positive. Plaintiff continued to have significant, intractable pain. Dr. Dickman recommended an anterior lumbar interbody fusion, a procedure which presented a 70-80% chance of positive outcome and complete resolution of Plaintiff's symptoms. Dr. Dickman also explained that a 10-20% chance existed of surgical failure with continued pain, and a 5% risk of major complication. Plaintiff understood the risks and opted to undergo anterior lumbar interbody fusion. (DSOF, Ex. 17, ML-Booth 0083.)

On March 22, 2001, Plaintiff informed MetLife that she was having back surgery on April 4, 2001. (DSOF ¶ 27.) On April 4, 2001, Dr. Dickman performed an anterior lumbar interbody fusion at L5-S1 without complication. (DSOF, Ex. 20, ML-Booth 0072.) Plaintiff convalesced without incident and was discharged on April 9, 2001. (Id.) On April 27, 2001, Plaintiff followed up with Dr. Dickman. (DSOF ¶ 30.) Dr. Dickman reported that Plaintiff was making excellent postoperative recovery, and recommended that she remain off work until her next evaluation in approximately eight weeks. (DSOF, Ex. 21, ML-Booth 0071.) In an Attending Physician Statement ("APS"), Dr. Dickman expected Plaintiff could return to work in 10-12 weeks. (DSOF, Ex. 22, ML-Booth 0500.)

In May 2001, Plaintiff applied for LTD benefits on account of her back pain, recent surgery, and inability to sit for periods of time. Plaintiff also noted that she had not been released from Dr. Dickman's care. (DSOF, Ex. 25, ML-Booth 0399.) Plaintiff also submitted a Training, Education and Experience Statement (DSOF, Ex. 23, ML-Booth 0501) and Employee's Statement Acknowledging Disclosure Responsibility (DSOF, Ex. 24, ML-Booth 502.) By letter dated June 22, 2001, MetLife informed Plaintiff that her claim for LTD benefits had been approved. That letter defined "disability" or "disabled," for the one-year period commencing immediately after the 52 weeks of STD benefits had

been paid, as being prevented from engaging in Plaintiff's occupation at AT&T.  After that one-year period, Plaintiff would be considered disabled under the Plan if, "in the sole opinion of the Claims Administrator, [Plaintiff] is determined to be incapable of performing the requirements of any job for any employer (including non-AT&T employment), (as a management or occupational employee), for which [Plaintiff] is qualified or may reasonably become qualified by training, education, or experience." (DSOF, Ex. 26, ML-Booth 0396-0397.)

On June 29, 2001, Dr. Dickman reported that Plaintiff was complaining of ongoing symptoms of back pain and pain radiating into her buttocks.  Plaintiff also reported recurrent episodes of epistaxis[1] and headaches.  Dr. Dickman requested that Plaintiff obtain radiographs of the lumbar spine to assess the status of her fusion, and recommended that she see an ear, nose, and throat surgeon for evaluation of her epistaxis.  One July 5, 2001, Plaintiff saw Dr. Michael Tingey, a pain management specialist.  Dr. Tingey noted that Plaintiff's pain was "worse than before the surgery," and that Plaintiff would undergo a workup with Dr. Dickman to determine the cause.  Dr. Tingey assessed Plaintiff as having chronic low back pain with recent exacerbation, and hypertension.  Dr. Tingey took Plaintiff off OxyContin as Plaintiff did not feel it helped much, and gave her Lortab 10 mg #120.  Dr. Tingey noted that Plaintiff's hypertension was controlled with medication.  (DSOF, Ex. 27, ML-Booth 0070.)

On August 9, 2001, Plaintiff returned to Dr. Tingey for follow-up pain treatment.  Plaintiff was still having "severe pain," and had experienced a few seizures in the preceding weeks.  Dr. Tingey assessed Plaintiff as having "[l]ow back pain syndrome status post failed surgery," and "[s]eizure disorder with increasing frequent episodes."  Dr. Tingey returned Plaintiff to OxyContin, with Lortab and Soma to be used as needed,

---

[1] Epistaxis: Hemorrhage from nose; nosebleed.  Clayton L. Thomas, Taber's Cyclopedic Medical Dictionary E-48 (13th ed. 1977).

1  for the back pain, and started Plaintiff on Dilantin for the seizures until she saw a

2  neurologist.  (DSOF, Ex. 29, ML-Booth 0784.)

3        On September 12, 2001, Plaintiff again returned to Dr. Tingey for follow-up.

4  Plaintiff had experienced no further seizures since taking Dilantin, and her increased

5  OxyContin was helping with her pain.  Plaintiff stated that she had trouble sleeping since

6  she was taken off Amitriptyline, and had questions regarding her heart strength.  Dr.

7  Tingley continued Plaintiff's OxyContin and Dilantin, and restarted her on Amitriptyline

8  to treat insomnia.  Dr. Tingley noted Plaintiff's "[h]istory of arterial occlusion in her left

9  upper extremity.  She continues to stay on Plavix."  (DSOF, Ex. 30, ML-Booth 0783.)

10        On September 24, 2001, Dr. Dickman reported that radiographs of Plaintiff's

11  lumbar spine demonstrated stable spine alignment, no evidence of non-union, and good

12  position of the cages inserted as part of the fusion surgery.  Dr. Dickman noted that

13  Plaintiff was taking Dilantin for seizures, and that Plaintiff felt "she has not benefitted at

14  all from the surgery," on account of her ongoing back pain.  Dr. Dickman also noted

15  "[Plaintiff] has normal strength, sensation, and reflexes in the lower extremities.  There

16  are no trophic[2] changes or changes consistent with reflex sympathetic dystrophy."  Dr.

17  Dickman recommended that Plaintiff be referred to a pain management specialist for

18  treatment of her back and leg pain.  (DSOF, Ex. 31, ML-Booth 0065.)

19        On December 11, 2001, Plaintiff saw Dr. Estelle Farrell for pain management at

20  Dr. Dickman's referral.  Plaintiff stated that four Lortab a day gave her minimal relief,

21  Vicodin helped "a little," and OxyContin gave her no relief.  Plaintiff had experienced

22  chest pains and palpitations, rectal bleeding, nose bleeds and headaches.  Plaintiff smoked

23  a pack of cigarettes per day, and was interested in stopping.  Dr. Farrell conducted a

24  physical examination and noted that Plaintiff walked without signs of distress, moved

25  

26        [2] Trophic:  Concerned with nourishment.  Applied particularly to a type of efferent nerves
believed to control the growth and nourishment of the parts they innervate.  Thomas, supra note 1,
at T-75.

freely and transferred easily, and ambulated well with a normal gait.  Plaintiff's lumbar range of motion was "markedly limited to only 10% of normal range of motion with a lot of guarding for any kind of range of motion testing."  Plaintiff's motor testing was recorded as 5/5 throughout, and Plaintiff appeared alert, oriented, and able to follow directions.  Dr. Farrell also noted that results of special testing were negative.  (DSOF, Ex. 34, ML-Booth 0381-0383.)

On December 26, 2001, Plaintiff returned to Dr. Farrell.  (DSOF ¶ 50.)  The results of a physical examination were essentially unchanged from the December 11, 2001 visit. Plaintiff noted no significant difference with the medications Dr. Farrell previously gave her.  Dr. Farrell diagnosed Plaintiff with cardiac abnormalities, low back pain with some residual radiculopathy and neuropathic pain, and ruled out osteoporosis.  Plaintiff's cardiac status had prevented her from undertaking aquatic physical therapy.  Dr. Farrell recommended Plaintiff start land therapy, gave her a prescription for Celebrex, increased her Oxycontin to 60 mg, and gave her MS IR for breakthough pain.  Dr. Farrell noted that Plaintiff had a narcotics contract with her office.  (DSOF, Ex. 35, ML-Booth 0061.)

On January 15, 2002, Plaintiff saw Dr. Daniel Einhorn, a cardiologist, for a second opinion regarding her heart condition.[3]  Plaintiff stated that she experienced problems with high blood pressure and a racing or slow heartbeat since her last back surgery, and experienced near syncopal episodes.[4]  On physical examination, Plaintiff was alert, oriented, and in no acute distress.  Dr. Einhorn's impression of Plaintiff's condition was "1.  Near syncope, etiology indeterminate.  2.  Hypertension.  3.  Continued smoking and heavy caffeine usage."  Dr. Einhorn advised Plaintiff that the smoking and caffeine could be causing arrythmia, and applied an event recorder which Plaintiff could carry for one

---

[3]  Plaintiff had previously seen Dr. Breed, a cardiologist, on or around October 30, 2001 and January 2, 2002.  (See DSOF, Ex. 77, ML-Booth 0007.)

[4]  Syncope: A transient loss of consciousness due to inadequate blood flow to the brain. SYN: fainting; swoon.  Thomas, supra note 1, at S-143.

month and record her heart rhythm during episodes.  (DSOF, Ex. 36, ML-Booth 0759-0760.)

On January 30, 2002, Dr. Farrell conducted another physical examination of Plaintiff.  Plaintiff had significantly decreased range of motion of the lumbar spine secondary to guarding.  Plaintiff had experienced "four or five black outs since her last visit."  Dr. Farrell noted no significant motor limitations, but noted some guarding.  Plaintiff had significant trigger points, and was given four trigger point injections with some improvement.  Dr. Farrell's impression was unchanged, and anticipated an evaluation through Dr. David Suber for Plaintiff's "black outs."  Dr. Farrell stated she would "get a CT of the spine to see if there are any abnormalities or instability of the fusion."  Dr. Farrell noted that Plaintiff "tried to get a prescription for Vicodin or Lortab filled yesterday under Dr. Tingey's prescription . . . [s]he had a long discussion with her primary care doctor, as well as myself today, concerning this."  A note from cardiologist Dr. Breed dated January 2, 2002 expressed concern that Plaintiff's narcotic medications were too strong.  (DSOF, Ex. 37, ML-Booth 0059-0060.)

Results from a February 6, 2002 CT exam of Plaintiff's lumbar spine revealed that the surgical changes at L5 had not changed, nor had the position and alignment, though the interbody spacing devices interfered somewhat with evaluation of the disc at L5-S1.  There did appear to be mild disc bulging at the L2-3 and L3-4 levels which minimally impressed upon the thecal sac.  Disc bulging to a greater degree could be seen at the L4-5 level, also impressing upon the thecal sac.  These results were sent to Dr. Farrell.  (DSOF, Ex. 39, ML-Booth 0049.)  A later CT exam was taken on February 21, 2002, and again revealed postoperative and degenerative change with no acute process identified.  (DSOF, Ex. 41, ML-Booth 0057.)

In February 2002 Plaintiff underwent a neurological examination with Dr. David Suber.  A physical examination of Plaintiff showed no acute distress.  A neurological

examination did not reveal anything abnormal, though Plaintiff walked with a limp and was slightly tender in the lumbar region. The etiology of Plaintiff's "blackouts" or "episodes" remained unclear. Dr. Suber's impressions included chronic opiate therapy for chronic pain, status post multiple surgeries, history of recurring epistaxis (nosebleeds), and a history of smoking. Dr. Suber recommended an MRI brain scan, an MR angiogram, an EEG, and additional lab studies. Dr. Suber's office would not prescribe opiates, as Plaintiff was receiving them from Dr. Farrell, and noted that opiates can lower the seizure threshold. (DSOF, Ex. 40, ML-Booth 0768-0770.)

On February 22, 2002, Plaintiff saw Dr. Dickman for a follow-up. Dr. Dickman noted that Plaintiff would continue seeing Dr. Farrell for therapy and pain management, and recommended Plaintiff see him in one year for additional follow up. (DSOF, Ex. 41, ML-Booth 0056.)

On February 25, 2002, MetLife notified Plaintiff that her claim for LTD benefits was being reviewed and that office notes and a request for test results had been faxed to Drs. Farrell, Suber, and Dickman. (DSOF ¶ 53.)

From May 21 through May 22, 2002, Plaintiff underwent a long term EEG video monitoring session with Dr. Joseph Sirven at the Mayo Clinic. Plaintiff experienced two episodes during that session.[5] The EEG monitor captured both episodes, neither of which involved any EEG change or seizures. The fact that Plaintiff's episodes did not cause an EEG change suggested spells of nonepileptic origin. (DSOF, Ex. 42, ML-Booth 0184.) Plaintiff remained anxious during the session and required discharge due to the inability to continue monitoring. (DSOF, Ex. 43, ML-Booth 0220.)

Dr. Drazkowski also examined Plaintiff on May 21, 2002 and concurred that nonepileptic seizures was "the most likely diagnosis." (DSOF, Ex. 43, ML-Booth 0220.)

---

[5]  Another episode apparently occurred prior to Plaintiff being hooked up to the EEG monitor. (DSOF, Ex. 44, ML-Booth 0187.)

A physical exam was limited by Plaintiff's post-episodal state, though Plaintiff could move all four limbs with equal strength.  Plaintiff's speech was slow and deliberate, and neurological and funduscopic examinations were difficult due to poor cooperation.  Plaintiff was to be admitted, tapered off her Neurontin,[6] and given a Nicoderm patch.  Plaintiff was to see Dr. Jennifer Bortz from Neuropsychology.  (DSOF, Ex. 44, ML-Booth 0186-0187.)

On May 22, 2002, Plaintiff saw Dr. Bortz.  Plaintiff was alert and oriented, though Plaintiff "wax[ed] and wane[d] with regard to her clinical events."  The results of a neuropsychological evaluation were considered unreliable due to "considerable psychiatric overlay."[7]  Dr. Bortz discussed at length with Plaintiff and her parents the nonepileptic seizure diagnosis, recommended individual psychotherapy, and recommended two therapists experienced in treating individuals with "similar conversion symptoms."[8]  Dr. Bortz found it "likely that aspects of [Plaintiff's] pain disorder reflect somatization tendencies as well."[9]  Dr. Bortz also found that formal neuropsychological evaluation may be useful on an outpatient basis.  (DSOF, Ex. 45, ML-Booth 0180-0181.)

Plaintiff followed up with Dr. Drazkowski before being discharged from the Mayo Clinic.  Plaintiff experienced another episode while in the recovery room.  Dr. Drazkowski also noted some elevated liver functions, and referred Plaintiff to a hepatologist.  He also indicated that some of Plaintiff's medications could be tapered down depending on the results of a liver workup.  A physical exam prior to discharge was

---

[6]  Neurontin had replaced Dilantin to treat Plaintiff's episodes.

[7]  Psychiatric overlay:  Mental symptoms added to those initially present because of the basic disease or defect.  Thomas, supra note 1, at O-41.

[8]  Conversion symptom:  A term for a repressed emotion that becomes manifest through a physical symptom; seen in hysteria.  Thomas, supra note 1, at C-109.

[9]  Somatization: Conversion of an emotional, mental, or psychosocial problem into a physical complaint.  Merriam-Webster's Medical Dictionary (2002).

normal, and Dr. Drazkowski stated that Plaintiff's episodes "are clearly nonepileptic seizures at this point in time."  His final diagnosis was "[h]istory of nonepileptic seizures."  (DSOF, Ex. 46, ML-Booth 0182-0183.)

On June 10, 2002, MetLife sent a letter to Plaintiff reminding her of her responsibility to communicate with MetLife representatives.  (DSOF, Ex. 47, ML-Booth 0376.)

On June 19, 2002, Plaintiff followed up with Dr. Sirven.  Dr. Sirven instructed Plaintiff to follow up with the psychological follow up suggested by Dr. Bortz.  There "clearly [was] not a neurologic cause" for Plaintiff's episodes, and Dr. Sirven wanted to make certain there was no cardiac cause.  An evaluation was to be arranged with the Cardiology Arrhythmia Clinic.  Liver function tests were not available at the time, but Plaintiff appeared to be improving in that regard.  (DSOF, Ex. 48, ML-Booth 0176.)

On August 19, 2002, Plaintiff underwent an electrophysiology consult with Dr. Luis Scott for evaluation of syncope.  Plaintiff stated that she had experienced three or four episodes per day at one time, and currently experiencing them daily.  Plaintiff further stated that she felt tired and fatigued after the episodes, reduced her level of activity, and had gained weight.  A systems review was significant for problems sleeping, related to Plaintiff's episodes and a high stress level.  An electrocardiogram showed "sinus rhythm with borderline QTc interval, otherwise normal appearing."  Dr. Scott's impressions were: "1.  Recurrent syncope possibly associated with seizure-like activities.  2.  Chronic narcotics use for back pain.  3.  Status post spinal fusion and herniated disk.  4.  Moderate obesity."  Dr. Scott recommended an echocardiogram to rule out structural heart disease, a head-up table tilt test, and an event recorder to document heart rhythm during the episodes of syncope, with further recommendations depending on the results of these tests.  (DSOF, Ex. 49, ML-Booth 0173-0174.)

On August 21, 2002, Nanette Gyongyos, RN conducted a home visit on behalf of MetLife to assess Plaintiff's medical status.  Plaintiff "did not appear to be in poor physical condition."  Plaintiff was still smoking one-half of a pack of cigarettes per day, and reported her weight as 200 pounds.  Gyongyos expressed skepticism that Plaintiff's parents could "successfully manage her reported 4-5 seizures and falls daily without problems occurring."  During the two-hour visit, Plaintiff "did not appear confused in any way and did not have a seizure."  Plaintiff expressed a desire to return to work, but uncertainty whether she could until the seizures and pain abated.  Plaintiff also stated that pain prevented her from sleeping through the night, and thus she slept on and off during the day.  The cause of Plaintiff's seizures remained "a mystery" to the physicians.  Gyongyos also noted that Dr. Farrell would not renew Plaintiff's narcotic pain medications, and Gyongyos expressed concern about withdrawal symptoms.  (DSOF, Ex. 52, ML-Booth 0732-0735.)

On August 23, 2002, Plaintiff returned to Dr. Scott for a tilt table test.  The results were normal.  (DSOF, Ex. 50, ML-Booth 0165.)  Plaintiff returned again on September 9, 2002.  An echocardiogram taken August 30, 2002 showed normal left ventricular size with mildly decreased left ventricular systolic function.  Dr. Scott ruled out arrhythmogenic synocope as a cause of Plaintiff's episodes, but neurocardiogenic synocope was not completely ruled out.  He also suggested an implantable loop recorder ("ILR") for recording the heart rhythm during episodes.  (DSOF, Ex. 51, ML-Booth 164.) Plaintiff subsequently underwent a successful implantation of an ILR at the Mayo Clinic. (DSOF, Ex. 53, ML-Booth 0198.)

On August 30, 2002, Plaintiff saw Dr. Mary Merkel for pain management.  On a pain scale of zero to ten, with ten being the worst, Plaintiff rated her pain as a six at best, typically an eight, and a ten at worst.  Walking, standing, sitting, bending, twisting, lifting, carrying, and kneeling aggravated the pain.  Upon physical evaluation, Plaintiff

appeared alert, oriented, and in no acute discomfort.  Plaintiff had some tenderness over the lumbar paraspinal muscles, performed heel walking with difficulty, and performed squat and rise with difficulty.  Dr. Merkel recommended that Plaintiff continue with stretches for her back rehab and consider a yoga class.  She did not recommend that Plaintiff remain on her then-current dose of pain medication, expressing concern that Plaintiff could develop a tolerance and other adverse side effects.  MS Contin was decreased to 80 mg twice daily, and MS IR stayed at 30 mg twice daily, with a desire to continue lowering both medications.  (DSOF, Ex. 52, ML-Booth 0050-0053.)

On October 21, 2002, Plaintiff returned to Dr. Merkel.  The results from Dr. Merkel's physical exam remained unchanged from the August 30, 2002 exam.  At the time, Plaintiff was taking MS Contin 60 mg twice per day.  Dr. Merkel further weaned Plaintiff to MS Contin 45 mg twice per day, continued short-acting morphine sulfate at 30 mg twice per day, and recommended follow up with Dr. Dickman.  (DSOF, Ex. 55, ML-Booth 0046-0048.)

On November 18, 2002, Plaintiff again followed up with Dr. Merkel.  Plaintiff stated that was having more back and leg pain, but walked her dog and would typically walk for 45 minutes four times per day.  Plaintiff had fallen a few times while walking because her left leg "gave out."  Plaintiff also complained of pain in the bottom of her right heel. Toe and heel walking, and squat and rise, were deferred due to pain.   Dr. Merkel's impression was "[c]hronic back and leg pain with weakness in the left leg."  MS Contin was further weaned to one dose at 30 mg per day and another dose of 45 mg per day; short-acting morphine sulfate was continued at 30 mg twice per day.  Plaintiff was encouraged to see a podiatrist about her foot pain.  (DSOF, Ex. 56, ML-Booth 0043-0045.)

On December 16, 2002, MetLife notified Plaintiff that her claim was under review, and that MetLife was requesting records from Laura Masters and Drs. Merkel, Breed, Dickman, Farrell, and Suber.  (DSOF ¶ 78.)

On December 18, 2002, a MetLife Behavior Health Initial Functional Assessment Form was completed by Laura Masters, MSW, CSIW.  Ms. Masters was of the opinion that Plaintiff could not perform the same job at AT&T or a different company.  Ms. Masters noted pain, emotional distress, social isolation, depression and conversion symptoms, starring [sic] spells, and cognitive decline as specific symptoms prohibiting Plaintiff from returning to work.  (DSOF, Ex. 58, ML-Booth 0340-0346.)  Ms. Masters did not see Plaintiff after this visit.  (DSOF, Ex. 59, ML-Booth 0362.)

On January 13, 2003, Plaintiff returned to Dr. Merkel for follow-up.  Plaintiff reported that her back "went out" the previous week.  Pain continued and was shooting down her legs.  Plaintiff had 5/5 motor strength in all major muscle groups, except for weakness of the left extensor hallucia longus and tibiallis anterior.  Plaintiff continued under the care of Dr. Dickman, but he could not recommend further surgical treatment until Plaintiff's cardiac history was cleared.  Plaintiff reported that the cardiologists had found "something" on the ILR.  Plaintiff was also being treated for her liver, and Dr. Merkel wanted that doctor to clear Plaintiff before proceeding with any epidural steroid injections.  Dr. Merkel weaned MS Contin to a total of 45 mg per day, with one dose of 15 mg and one dose of 30 mg.  Morphine sulfate continued at 30 mg twice daily.  Dr. Merkel hoped to further reduce Plaintiff's MS Contin dosage.  (DSOF, Ex. 60, ML-Booth 0040-0042.)

On January 17, 2003, MetLife sent a letter to Dr. Dickman requesting copies of "progress/office notes and test/lab results beginning September 1, 2002 to the present."  MetLife requested that Dr. Dickman include an estimated return to work plan, and indication of what symptoms limited return to work at that time.  (DSOF, Ex. 61, ML-

Booth 0323.)  The custodian of records responded, stating that no patient records existed for that time period, i.e., September 1, 2002 to January 17, 2003.  (Id.)

On April 29, 2003, MetLife wrote Plaintiff to request completion of an Attending Physician Statement by her treating physician, along with supplemented copies of medical records, test results, and office notes.  MetLife also informed Plaintiff that her failure to return the requested information by May 27, 2003 could result in the denial of her claim.  (DSOF, Ex. 62, ML-Booth 0293.)  MetLife sent another letter on that date requesting completion of an authorization form, medication list form, and activities of daily living form.  Plaintiff completed and returned these forms.  (DSOF, Ex. 63, ML-Booth 0281-0283.)

On May 19, 2003, Dr. Tingey completed an Attending Physician Statement ("APS") and diagnosed Plaintiff with low back pain and degenerative disc disease.  Dr. Tingey believed Plaintiff was unable to perform job duties because severe pain limited her ability to sit or stand for prolonged periods.  Dr. Tingey had not made any objective findings since January 1, 2003, and was awaiting test results.  Dr. Tingey had not advised Plaintiff to return to work.  (DSOF, Ex. 64, ML-Booth 0271-0273.)  Dr. Tingey later provided MetLife with copies of two office notes.  These notes indicated that he refilled Plaintiff's pain medications and was awaiting further work-up regarding her back.  (DSOF, Ex. 65, ML-Booth 0254-0255.)

On October 6, 2003, Plaintiff followed up with Dr. Scott of the Mayo Clinic.  Dr. Scott noted during physical examination that Plaintiff was comfortable and in no distress.  Plaintiff stated that she had been feeling overall well, though she continued to experience episodes on a regular basis.  Dr. Scott noted that Plaintiff did not complete the formal neuropsychological evaluation recommended by Dr. Bortz.  Plaintiff's ILR had not detected any significant arrhythmia over the previous year to justify loss of consciousness.  Plaintiff's hypertension was still not controlled, and Dr. Scott

recommended increasing the dosage of related medications.  Dr. Scott also discussed Dr.
Bortz's recommendation of outpatient neuropsychological evaluation, and Plaintiff was
willing to undergo such testing at that time.  (DSOF, Ex. 67, ML-Booth 0144-0145.)

On November 3, 2003, Dr. R. Kevin Smith conducted a Physician Consultant
Review of Plaintiff's medical records submitted in support of her LTD claim.  Dr. Smith
was asked to determine, based on the medical records available, whether Plaintiff was
impaired from doing any type of gainful employment.  Dr. Smith noted that Plaintiff was
primarily limited due to possible seizure disorder and chronic low back pain.  The cause
of Plaintiff's seizure disorder and episodes was unclear from the records available, and
Dr. Smith was unable to explain her inability to work or subjective complaints based on
"the objective medical evidence in the records available."  Dr. Smith noted that the
records from the Mayo Clinic workup, and EEG, MRI, or MRA records from different
times, were not provided.  (DSOF, Ex. 68, ML-Booth 0243-0247.)

Dr. Smith did not believe the objective medical evidence precluded Plaintiff from
gainful employment as it related to her chronic back condition and seizure disorder.
Plaintiff's back pain required maintenance with opioid pain medication, but Plaintiff did
not have neuromuscular impairments or functional limitations that would preclude
working at a sedentary job.  However, Dr. Smith stated that Plaintiff "may be unable to
sustain gainful employment [as] it relates to her mental/nervous condition of conversion
reaction and depression."  He concluded that the medical records would support her
ability to work within a sedentary work capacity level as it relates to her physical
condition, but that review by a psychiatrist might be warranted if Plaintiff had retained
mental or nervous benefits per her disability policy.  (Id.)

On December 17, 2003, MetLife notified Plaintiff that an independent physician
consultant reviewed her file.  The letter informed Plaintiff that a copy of Dr. Smith's
report was faxed to Dr. Tingey, and that Dr. Tingey was requested to respond if he

disagreed with Dr. Smith's conclusion.  MetLife asked Plaintiff to contact Dr. Tingey to insure that he submit any additional information to support his opinion.  The letter gave Plaintiff until January 15, 2004 to complete these requests.  (DSOF, Ex. 69, ML-Booth 0360.)  MetLife's letter to Dr. Tingey requested that he submit "objective medical evidence to support continuing disability" if he disagreed with Dr. Smith's report.  (DSOF, Ex. 70, ML-Booth 0361.)

On January 8, 2004, Dr. Tingey responded to MetLife's letter by submitting an office note from a December 29, 2003 visit by Plaintiff.  Dr. Tingey stated that Plaintiff's main difficulty with her low back pain and ability to work included problems with any prolonged sitting, which was difficult to qualify with an objective measure.  He stated that it was also difficult to qualify with an objective measure Plaintiff's seizure-like activity and conversion disorder, and that it was difficult to assess how the seizures would impact her work.  Dr. Tingey noted that he and Plaintiff had discussed sending her for a physical therapy evaluation for objective measurements of range of motion and function regarding her lower back pain, and that Plaintiff could follow up with a psychologist to further evaluate a possible conversion disorder.  Dr. Tingey did not think that Plaintiff was able to return to work without restriction, given Plaintiff's multitude of symptoms, continued back pain, and seizure or conversion disorder.  (DSOF, Ex. 71, ML-Booth 0239-0240.)

Dr. Smith reviewed Dr. Tingey's response, and reported that Dr. Tingey did not provide any further objective measures concerning Plaintiff's inability to work.  Dr. Smith felt that a functional capacity exam would not be helpful given Plaintiff's history of conversion disorder; he thought it likely that she would self-limit many activities and would not give valid or helpful results.  Dr. Smith concluded that the available medical records supported Plaintiff's ability to work in a sedentary work capacity level with brief stretch breaks every 60 minutes.  (DSOF, Ex. 72, ML-Booth 0237-0238.)

On March 4, 2004, Plaintiff saw Dr. Komandoor Srivathsan for follow up regarding her episodes.  The ILR had not documented any arrhythmia to account for her symptoms, and Dr. Srivathsan recommended removing the ILR as soon as possible.  Plaintiff had not followed up with neuropsychiatric testing due to insurance and financial issues.  Dr. Srivathsan noted that no further follow up was needed with the Electrophysiology Clinic.  Dr. Scott also saw Plaintiff that day and concurred with Dr. Srivathsan's notes.  Dr. Scott recommended Plaintiff obtain a referral for another neuropsychiatric test somewhere her insurance would cover.  (DSOF, Ex. 73, ML-Booth 0141-0142.)

### D.  Termination of LTD Benefits

On March 10, 2004, MetLife informed Plaintiff of its decision to terminate her LTD benefits effective February 29, 2004.  The termination letter discussed the terms of the Plan and described the documents reviewed.  It also described Dr. Smith's opinion, Dr. Tingey's response, and Dr. Smith's reply.  Based on its review, MetLife concluded that "the information in the file . . . does not support a disability of such severity as to keep [Plaintiff] from doing [her] own job or any other job [she] may be qualified for."  The letter also informed Plaintiff of the proper appeal procedure.  (DSOF, Ex. 74, ML-Booth 0233-0236.)

On August 26, 2004, Plaintiff, through her attorney, appealed MetLife's termination of her LTD benefits.  Plaintiff's counsel noted that Plaintiff had an appointment "to be independently evaluated as to her physical capacities to engage in meaningful employment activities."  With her appeal, Plaintiff enclosed a set of Plaintiff's current medical records for MetLife's review and consideration.  Plaintiff also requested that all relevant claim and Plan documents be forwarded to her counsel.  (DSOF, Ex. 75, ML-Booth 0034-0035.)

On September 14, 2004, Plaintiff's counsel informed MetLife that he had received from MetLife 278 pages of Plaintiff's records. He noted that the 126 pages of documents were not accompanied by a cover letter, nor were the documents Bates-stamped or numbered. He also noted that the remainder of the documents consisted of partial sets and copies of Bates-stamped records previously provided to MetLife by counsel. (DSOF, Ex. 0076, ML-Booth 0023.)   Plaintiff contends that the entire claim file provided after litigation consists of over 1000 pages.[10]  (PSOF ¶ 103.)

On October 11, 2004, Dr. Joseph Jares, III, board certified in Neurology, completed an independent review of Plaintiff's claim. (DSOF, Ex. 77, ML-Booth 0004-0011.) Dr. Jares's report catalogued the records provided for review. He identified Plaintiff's primary diagnosis as failed back syndrome and listed her other diagnoses: status post anterior interbody fusion; spells likely conversional in origin; depression; elevated liver function test of uncertain etiology; hypertension; radial artery occlusion; and status post hysterectomy. (Id. at 0008.) Despite these diagnoses, Dr. Jares concluded that Plaintiff retained the ability to work full-time in a sedentary occupation, with allowance for repositioning breaks as needed. (Id.) Dr. Jares also opined that Plaintiff should not work at heights or around dangerous machinery, nor should she drive. (Id.)

Also on October 11, 2004, Dr. Philip Jordan Marion, board certified in Physical Medicine and Rehabilitation, completed a review of Plaintiff's records. Dr. Marion catalogued Plaintiff's records provided to him for review and identified Plaintiff's primary physical medicine diagnosis as chronic low back pain and status post lumbar spine fusion. Dr. Marion noted that the history, physical examination, and testing supported the diagnosis of chronic low back pain, and that the radiological studies were consistent with lumbar spine surgery. These findings placed Plaintiff's impairment in the

_____

[10]  The record in this case supports Plaintiff's contention. (See Dkts. 31-32, Admin. R. (901 pages); Dkt. 47, Supp. Admin. R. (91 pages).)

mild-to-moderate range.  Dr. Marion reported that Plaintiff's physical examinations demonstrate no neurological deficits, normal strength, sensation, and reflexes, and an ability to independently ambulate and perform all activities of daily life.  Given Plaintiff's use of opiates and possible history of seizure, Dr. Marion suggested Plaintiff be restricted from driving, working at heights, and using sensitive machinery and materials.  Dr. Marion concluded that Plaintiff was capable of working in a sedentary to light duty level, consistent with her sedentary job as a customer care associate.  He also concluded that the records did not offer findings of physical impairment that would have prevented Plaintiff from working in a sedentary position as of March 1, 2004.  (Id. at 0012-0016.)

On October 21, 2004, MetLife sent Plaintiff a letter notifying her that it had completed its review on appeal and that it was upholding its decision to terminate her LTD benefits.  MetLife informed Plaintiff that the medical documentation did not support a total disability from any occupation as defined by the Plan and as of March 1, 2004. The letter explained the grounds for MetLife's decision: the terms of the Plan; the nature of Plaintiff's occupation; the medical records submitted to MetLife, including additional records submitted on appeal; and the independent consultation opinions of Drs. Jares and Marion.  The letter did not reference an independent physical capacities evaluation. MetLife informed Plaintiff of her right to bring a civil action under ERISA.  (DSOF, Ex. 78, ML-Booth 0019-0022.)

**E.  Procedural History**

Plaintiff commenced this action on April 26, 2005.  (See Dkt. 1, Compl.) Defendants MetLife and the Plan filed a motion for summary judgment on August 3, 2007.  (Dkt. 21.)  Plaintiff filed a response and cross-motion for summary judgment on October 10, 2007.[11]  (Dkt. 37.)  The Court later stayed and remanded the proceeding to

---

[11]  The Court granted the parties' stipulation to extend the deadlines for filing motions for summary judgment.  (Dkt. 35, Order dated Sept. 13, 2007.)

the claim administrator in order to evaluate a functional capacity examination ("FCE" or "Theracomp FCE") attached to Plaintiff's cross-motion for summary judgment but not part of the Administrative Record.[12] (Dkt. 45, Order dated Nov. 28, 2007.)  On remand, MetLife requested that all of Plaintiff's medical information, including the Theracomp FCE report, be examined by a neurologist, a physical medicine and rehabilitation specialist, and a pain management specialist.  (Dkt. 49, Defs.' Reply Statement of Facts ("DRSOF") ¶ 123.)

On December 25, 2007, Dr. Ahmed T. Robbie, board certified in Neurology, completed an independent review of Plaintiff's medical information, including the Theracomp FCE report, and prepared a report outlining his findings and opinions as to whether Plaintiff's medical information supported functional limitations affecting her ability to perform a sedentary job.  (DRSOF, Ex. 79, ML-Booth 1021-1026.)  Dr. Robbie's report noted that Plaintiff had two back surgeries in 2001 and 2002 and persistent back pain with some tenderness in the lower back.  (Id. at 1024.)  Dr. Robbie attempted to contact Dr. Dickman, who performed Plaintiff's surgeries, and was informed by Dr. Dickman's office that Dr. Dickman had not seen Plaintiff since August 2004.  (Id. at 1022.)  Dr. Robbie's report noted that an MRI and CT scan performed after Plaintiff's back surgeries did not reveal any herniated disc, radiculopathy, or focal finding of any physical impairment.  (Id. at 1024.)  Dr. Robbie's report further noted exams conducted by Dr. Merkel in which Plaintiff: had normal strength, sensations, gait, and coordination in the lower extremities; had no muscle atrophy; was able to toe walk and heel walk without any difficulty; and could squat and rise without difficulty.

---

[12] Plaintiff submitted a letter dated September 24, 2004, from Plaintiff's counsel to MetLife, and stating that the FCE results were enclosed.  (PSOF, Ex. 89.)  Plaintiff did not object to Defendants' motion to remand, but reserved the right to object to any findings or decisions reached on remand.  (Dkt. 44, Pl.'s Resp. to Defs.' Mot. to Remand.)

Dr. Robbie reviewed the Theracomp FCE report and noted that it confirmed Plaintiff's ability to perform sedentary to light job functions.  (Id. at 1025.)  According to Dr. Robbie, the Theracomp FCE report indicated that Plaintiff's dexterity movements were average, her gait was slightly slow, balance was normal, she was able to do partial squats, she was able to perform her daily activities without much limitation, she was able to climb, and she was able to lift 18 pounds, all of which indicated an ability to perform sedentary to light work.  Dr. Robbie also noted Plaintiff had blackout episodes consistent with pseudoseizures or conversion disorder, and the Mayo Clinic found these events to be psychological or non-epileptic.  Regarding Plaintiff's blackouts and pseudoseizures, Dr. Robbie opined that these episodes restricted Plaintiff from working in high altitudes or operating heavy machinery.  (Id. at 1024.)

Dr. Robbie also considered whether the medications prescribed to Plaintiff limited her ability to work.  He opined that Plaintiff's medications prescribed as of March 1, 2004 did not cause her any functional impairment or safety risk because there was no documentation in the medical records that Plaintiff's medications caused impairment to her cognition, memory or attention.  (Id. at 1026.)  Dr. Robbie concluded that Plaintiff had some functional limitations from her two back surgeries, multiple narcotic use, and blackouts, but that Plaintiff's medical information and the Theracomp FCE report showed that she retained the ability to perform sedentary to light full time work since March 1, 2004.

On December 26, 2007, Dr. Howard Grattan, board certified in Physical Medicine and Rehabilitation, completed an independent review of Plaintiff's medical information, including the Theracomp FCE report, and prepared a report outlining his findings and opinions as to whether Plaintiff's medical information supported functional limitations. (DRSOF, Ex. 80, ML-Booth 1016-1020.)  Dr. Grattan contacted Dr. Farrell's office and was informed that Dr. Farrell had not seen Plaintiff since 2002.  Dr. Grattan attempted to

speak with Dr. Michael Wolff, but his telephone calls to Dr. Wolff's office were not returned.[13]

Dr. Grattan noted Plaintiff's main diagnoses consisted of failed back surgery syndrome, pseudo seizures, possible conversion disorder versus somatization disorder, and possible bradycardic syncope.[14]  Dr. Grattan noted that since Plaintiff's second surgery, the majority of the medical documentation suggested she had no weakness or numbness, and that her syncope was thoroughly evaluated at the Mayo Clinic and found to be non-epileptic in origin.  Dr. Grattan noted that Plaintiff had limited range of motion in the lumbar spine in all directions and the Theracomp FCE report noted subjective limitations to sitting tolerance due to pain and upper extremity strength and dexterity that were within normal limits.  Dr. Grattan concluded that Plaintiff's medical information did not support a functional limitation because: (1) she did not have decreased neurologic function in the upper or lower extremities; (2) there was no evidence of any significant pathology that would limit the strength in her legs regarding safety; and (3) there was no evidence she was continuing to experience seizures that would preclude her from working at heights.

In support of his opinion, Dr. Grattan noted Plaintiff's subjective complaints of pain and decreased range of motion secondary to pain, but that her neurologic examinations had remained essentially normal with no evidence of decreased power or atrophy, decreased coordination, decreased sensation, abnormal reflexes, or abnormal specific tests for various diagnoses that would necessitate restrictions or limitations in work activity.  (Id. at 1018-1019.)  Dr. Grattan reviewed the Theracomp FCE report and noted that Plaintiff's limitation relating to sitting tolerance was subjective and self-

---

[13]  Plaintiff had see Dr. Wolff, a pain management and physical medicine specialist, for an initial consultation on November 8, 2000.  (DSOF, Ex. 77, ML-Booth 0006.)  No follow up with Dr. Wolff  occurred.  (Id.)

[14]  Bradycardia: Slow heart action.  Thomas, supra note 1, at B-53.

limited, it was unlikely that Plaintiff performed full maximal effort, and Plaintiff's self-limited effort raised concerns about secondary gain.  Dr. Grattan concluded that the clinical findings in Plaintiff's medical records suggested Plaintiff could perform at much higher level than was seen on the FCE, particularly regarding flexion, extension, and range of motion of the low back.  (Id. at 1020.)

Dr. Grattan also considered whether the medication prescribed to Plaintiff limited Plaintiff's ability to work.  Dr. Grattan opined that Plaintiff's clinical picture did not reflect excessive sedation from opioids or safety concerns from opioids.  (Id.)

On December 26, 2007, Dr. Glenn D. Babus, a specialist in Pain Medicine and Pain Management, completed an independent review of Plaintiff's medical information, including the Theracomp FCE, and prepared a report outlining his findings and opinions as to whether Plaintiff's medical information supported functional limitations. (DRSOF, Ex. 81, ML-Booth 1027-1031.)  Dr. Babus contacted Dr. Farrell's office and was informed that Dr. Farrell had not seen Plaintiff since 2002.  Dr. Babus also attempted to speak with Dr. Wolff, but his telephone calls were not returned.

Dr. Babus opined that Plaintiff had no functional limitations from a pain standpoint because there was no documentation in Plaintiff's records of any real neurological deficits and Plaintiff's pathological tests, such as MRIs, EEGs, EMGs, EKGs and CTs, did not support a pathology requiring her not to work.  (Id. at 1029-30.) Dr. Babus reported that there were no physical findings of neurological deficits, decreased strength or decreased range of motion that supported a functional limitation. Dr. Babus further noted that Plaintiff's medical records and histories from Plaintiff's rehabilitation physicians, pain physicians, and neurological physicians had no pain diaries or quantitative analysis of her pain in percentage or VAS scores to support an inability to do sedentary work.  (Id. at 1030.)

1      Regarding the Theracomp FCE report, Dr. Babus noted that the FCE report on its

2 own was not valid due to lack of documentation. Dr. Babus reported the Theracomp FCE

3 report had no documentation, either by physical findings or pathology, to support the

4 conclusion that Plaintiff could not do sedentary work because she cannot sit for long

5 periods of time. (Id. at 1029-30.)  Dr. Babus further reported that the pain noted in the

6 Theracomp FCE would not allow a person to walk or sit.  Dr. Babus found the FCE report

7 was inconsistent with the clinical findings, and inconsistent with the MRI, CAT scans,

8 and the EMGs that showed no real pathological findings.  Dr. Babus also opined that

9 Plaintiff's medication did not cause any functional impairment or safety risk because no

10 documentation showed any psychological effects, memory loss or side effects that would

11 prevent Plaintiff from returning to work.  (Id. at 1030-31.)

12      On January 17, 2008, MetLife notified Plaintiff that it was upholding its

13 termination decision. (DRSOF, Ex. 82, ML-Booth 1008-14.)  MetLife's letter explained

14 the grounds for its decision, which included the terms of the Plan, the nature of Plaintiff's

15 occupation, all medical information submitted to MetLife, including the medical

16 information submitted by Plaintiff on appeal and the Theracomp FCE report, and the

17 independent consultants' opinions of Drs. Robbie, Grattan, and Babus.

18                       **STANDARD OF REVIEW**

19      The standard of review in ERISA claims depends on the role of the plan

20 administrator or fiduciary.  When a plan does not confer discretion upon a plan

21 administrator or fiduciary to determine eligibility for benefits or to construe the terms of

22 the plan, district courts should review the denial of benefits de novo.  Firestone Tire &

23 Rubber Co. v. Brush, 489 U.S. 101, 115 (1989).  If the benefit plan gives the

24 administrator or fiduciary discretionary authority to determine eligibility for benefits or to

25 construe the terms of the plan, denial of benefits should be reviewed for abuse of

26 discretion.  Id.

ERISA defines a fiduciary as one who "(i) exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation . . ., or (iii) has any discretionary authority or discretionary responsibility in the administration of [the] plan." 29 U.S.C. § 1102(21)(A). An entity or person is thus a fiduciary to the extent it exercises any discretionary authority or control. <u>Firestone</u>, 489 U.S. at 113. A plan administrator or fiduciary has discretion only where discretion is "unambiguously retained" by the administrator or fiduciary. <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc); <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

### DISCUSSION

The parties raise several issues for resolution. First is the appropriate standard of review. Plaintiff urges de novo review based on an alleged conflict in the Plan documents and MetLife's failure to consider the FCE on appeal. Second is MetLife's decision to credit the opinions of independent physician consultations over those of Plaintiff's treating physicians. Third is MetLife's requirement that Plaintiff submit "objective medical evidence" to support ongoing disability. The Court will address these issues in turn.

### A.  The Appropriate Standard of Review

The parties dispute whether the Court should review termination of Plaintiff's LTD benefits de novo, or for abuse of discretion. Defendants assert that abuse of discretion applies because the Plan granted MetLife discretionary authority. (Dkt. 21, Defs.' Mot. for Summ. J. 10:17-11:9.) Plaintiff asserts that a conflict exists as to whether Plan documents vest MetLife with discretionary authority, and thus de novo review applies. (Dkt. 37, Pl.'s Cross-Mot. for Summ. J. 3:4-4:15.) The alleged conflict arises because a Services and Financial Agreement ("SFA") between MetLife and AT&T

contains "no express or implied delegation of discretionary authority to MetLife." (Id. at

3:4-10; see also PSOF, Ex. 91.)  Plaintiff also asserts that de novo review should apply

because MetLife failed to consider the FCE report during her appeal.  (Dkt. 54, Pl.'s

Reply at 1:5-2:13.)

The default standard of review is de novo; abuse of discretion review only applies

if the ERISA plan unambiguously grants discretionary authority to the claims

administrator or fiduciary.  Firestone, 489 U.S. at 115; Abatie, 458 F.3d at 963.  If plan

documents conflict, courts generally bind ERISA defendants to the document more

favorable to the employee.  Banuelos v. Constr. Laborers' Trust Funds, 382 F.3d 897, 904

9th Cir. 2004), quoting Bergt. v. Ret. Plan for Pilots Employed by MarkAir, Inc., 293

F.3d 1139 (9th Cir. 2002).  Plaintiff asserts that the SFA controls because it does not

contain a grant of discretionary authority to MetLife and is more favorable to her.  (Pl.'s

Cross-Mot. for Summ. J. at 3.)  Therefore, Plaintiff contends, de novo review applies.

In Bergt, the plan master document unambiguously qualified the employee as a

member of the retirement plan, but the summary plan description ("SPD") unambiguously

excluded him.  See 293 F. 3d at 1144-46.  The plan master document was deemed to

control because it specified the terms of the plan, whereas the SPD simply summarized

the relevant provisions.  Additionally, the court held that the burden of uncertainty should

fall on the drafting party.  Id. at 1145.  The court noted that the law should provide a

strong incentive for employers to draft SPDs consistent with plan master documents, "a

relatively simple task."  Id.  Similarly, when two versions of the ERISA plan

existed—one including a five-year vesting period and one not—the version which

included a five-year vesting period was held to control because it was more favorable to

the employee.  Banuelos, 382 F.3d at 904.

In this case, Plaintiff's assertion that the SFA requires de novo review is

misguided.  Unlike the situation in Banuelos and Bergt, the conflict here is not between

Plan documents.  The master plan document states that the claims administrator "shall serve as the final review committee under the Plan and shall have sole and complete discretionary authority" to make conclusive determinations regarding, *inter alia*, benefits eligibility and interpretation of Plan provisions.  (Dkt. 53, Second Supp. to Admin. R. ML-Booth 0955.)  The master plan document also states that CIGNA is the claims administrator for the Plan.  (Id. at 0949.)  The SPD repeats the grant of discretionary authority to the claims administrator, and designates MetLife as the claims administrator for LTD benefits commencing on or after January 1, 2000.  (Id. at 0996, 0997, 1005; see also DSOF, Ex. 2, ML-Booth 0975.)

MetLife asserts that the SFA cannot be used to change the standard of review because it is not a "plan document" for ERISA purposes.  (Dkt. 48, Defs.' Reply 3:5-4:8 (citing Fritcher v. Health Care Serv. Group, 301 F.3d 811, 817 (7th Cir. 2002).)  Plaintiff notes that other courts have considered administrative services agreements like the SFA to determine the proper standard of review.  (Dkt. 54, Pl.'s Reply 3:17-4:19.)  Neither party cites controlling authority, and the parties' positions are not necessarily in conflict.  One the basic purposes of ERISA is to allow employees to inform themselves of their rights and obligations under the plan by examining the plan documents.  See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995).  The Plan documents here inform Plaintiff of her rights and obligations, including an unambiguous grant of discretionary authority to the claims administrator.  The SFA is useful insofar as it explains why MetLife does not appear in the master plan document, but does appear in the later-dated SPD; the SFA bridges this gap because it was executed in the interim period.  See Seimen v. Life Ins. Co. of N. America, 436 F.3d 805, 810 (7th Cir. 2006) (agreement relevant to determine whether discretion reserved in the plan was delegated); see also Nagele v. Elec. Data Sys. Corp., 193 F.R.D. 94, 102 (S.D.N.Y. 2000) (same).

1     Moreover, the SFA does not present a conflict regarding the claims administrator's

2    discretion.  Both the SPD and master plan grant discretion to the claims administrator,

3    and under the SFA MetLife agrees to act as claims administrator of the Plan and to

4    determine benefits eligibility "in accordance with the Plan and the Plan Document

5    attached hereto."  (Dkt. 39, PSOF, Ex. 91, SFA § 2.1.1.)  Therefore the SFA does not

6    require de novo review.

7     Plaintiff also asserts that de novo review should apply because MetLife failed to

8    consider the FCE during her appeal.  (Dkt. 54, Pl.'s Reply at 2:3-13.)  Plaintiff contends

9    that this failure "constitutes a serious and flagrant violation of ERISA regulations" and

10   warrants de novo review.  (Id. at 2:9-10.)  Plaintiff correctly notes that flagrant procedural

11   irregularities warrant de novo review.  Abatie, 458 F.3d at 973.  However, a procedural

12   irregularity "does not usually justify de novo review."  Id. at 972.  A smaller procedural

13   irregularity is a matter to be weighed in deciding whether an administrator's decision was

14   an abuse of discretion, just as a court would weigh a conflict of interest.  Id.  MetLife's

15   failure to consider the FCE report during Plaintiff's appeal is a smaller procedural

16   irregularity and was remedied by remand to the claims administrator.  MetLife's

17   termination of Plaintiff's LTD benefits will therefore be reviewed for abuse of discretion.

18   See Firestone, 489 U.S. at 115; Abatie, 458 F.3d at 963.  MetLife's failure to consider the

19   FCE report during the appeal will be weighed in deciding whether MetLife abused its

20   discretion.  Abatie, 458 F.3d at 972; Saffon v. Wells Fargo & Co. Long Term Disability

21   Plan, 511 F.3d 1206, 1212 (9th Cir. 2008).

22    The Court finds that MetLife's failure to consider the FCE report did not

23   significantly affect the proceedings in this case.  Once MetLife became aware that it had

24   not considered the FCE report, it requested a remand and 90-day stay of the proceedings.

25   (See Dkt. 43.)  MetLife then submitted the FCE report, along with the remainder of

26   Plaintiff's medical information, to a new set of physicians.  MetLife reaffirmed its

decision to terminate benefits, and explained why the FCE report did not warrant reinstatement of benefits.  Plaintiff's objections to that finding are discussed below, but the initial failure to consider the FCE report did not prejudice or otherwise adversely affect Plaintiff.  Therefore the procedural irregularity will be given little weight in determining whether MetLife abused its discretion.

Under abuse of discretion review, the Court must affirm MetLife's decision to terminate benefits if the decision was "based upon a reasonable interpretation of the plan's terms and made in good faith."  Bendixen v. Standard Life Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999).  MetLife's decision should not be disturbed unless the Court finds its factual findings were "clearly erroneous."  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004).  Plaintiff contends that MetLife's factual findings were "clearly erroneous" because MetLife gave the opinions of independent physician consultants greater weight than those of Plaintiff's treating physicians and the FCE report.  Plaintiff further contends that MetLife abused its discretion in requiring that Plaintiff submit "objective medical evidence" to support ongoing disability.

**B.  MetLife's Factual Finding**

The Court finds that the only disability for which Plaintiff may claim LTD benefits is her back pain, and not her syncopal episodes.  The Plan requires that a participant be under a physician's care and following a recommended course of treatment to be disabled.  (DSOF ¶ 10.)  Dr. Bortz recommended in May 2002 that Plaintiff undergo a formal neuropsychological evaluation to identify the cause of her episodes.  (DSOF, Ex. 45, ML-Booth 0180-0181.)  Dr. Sirven instructed Plaintiff to follow up on Dr. Bortz's recommendation.  (Id., Ex. 45, ML-Booth 0176.)  Dr. Scott repeated this recommendation on October 6, 2003.  (Id., Ex. 67, ML-Booth 0144-0145.)  As of March 2004, Plaintiff had not followed up with neuropsychiatric testing, apparently due to insurance and financial issues.  (Id., Ex. 73, ML-Booth 0141-0142.)  As neurological and cardiac causes

had been ruled out, Plaintiff was no longer under a physician's care and following a recommended course of treatment as the Plan required.  Accordingly, continued disability payments must be warranted by her back pain, not her episodes.  (See Dkt. 53, Second Supp. to Admin. R., ML-Booth 0944 (stating benefits may be terminated when employee no longer complies with Plan requirements).)

Plaintiff contends that MetLife's termination of LTD benefits was "clearly erroneous" because the opinions of MetLife's independent physician consultants "substantially conflict" with the findings of the FCE report and the opinions of Plaintiff's treating physicians.  (Pl.'s Cross-Mot. for Summ. J. at 13:21-14:10.)  Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians.  Black & Decker Disability v. Nord, 538 U.S. 822, 834 (2003).  However, administrators are not required to "accord special weight to the opinions of a claimant's physician."  Id.  A court may not overturn discretionary decisions by administrators for failure to defer to treating physicians' opinions.  Jordan, 370 F.3d at 879.  As long as the record demonstrates a reasonable basis for concluding that the medical condition was not disabling, the decision cannot be characterized as arbitrary.  Id.  However, an administrator's decision is arbitrary if it arbitrarily refuses to credit a claimant's reliable evidence.  Id.

In this case, Defendants did not arbitrarily refuse to credit Plaintiff's reliable evidence.  The record shows that MetLife and its independent physician consultants reviewed all medical records submitted by Plaintiff, and determined that the objective medical evidence did not support functional limitations or neuromuscular deficits that would prevent Plaintiff from performing sedentary work duties.  MetLife and its independent physician consultants focused on more objective indicators, such as x-rays and physical examinations, rather than Plaintiff's subjective reports of pain.  Even assuming that the treating physicians' recitations of Plaintiff's subjective pain symptoms

constitutes part of their opinions, MetLife is not required to defer to those opinions;

MetLife could reject those opinions on the basis of reliable evidence.  <u>Jordan</u>, 370 F.3d at

879.

Nor can it be said that Defendants ignored the results of the FCE.  Once

Defendants became aware of the FCE report, they requested a remand to MetLife so that

MetLife could evaluate the FCE report and determine whether it changed the decision to

terminate benefits.  (<u>See</u> Dkt. 43.)  Three new independent physician consultants then

reviewed Plaintiff's entire record, including the FCE report.  (<u>See</u> Dkt. 47, Supp. to

Admin. R.)  Dr. Grattan noted that "mild red flags" were suggestive but not conclusive of

poor effort, and the testing results were limited by Plaintiff's complaints of pain.  (<u>Id.</u> at

ML-Booth 1019.)  Dr. Grattan found it unlikely that Plaintiff put forth maximum effort,

and clinical findings suggested she could perform better.  (<u>Id.</u> at 1020.)  Dr. Robbie

questioned the validity of the FCE testing because tasks can be terminated for any

subjective reason, and the symptoms may not be consistent with clinical findings.  (<u>Id.</u> at

1025.)  Dr. Babus stated that Plaintiff put forth maximum effort, but that the FCE findings

were not supported by physical or pathological findings.  (<u>Id.</u> at 1030.)  These

conclusions led MetLife to affirm the original claim determination.  (<u>See id.</u> at 1014.)

MetLife did not arbitrarily refuse to credit reliable evidence when it discounted the

results of the FCE.  Drs. Grattan, Robbie, and Babus each expressed skepticism regarding

the FCE results because the evaluation itself is a result of the participant's level of effort.

The initial physician consultant, Dr. Smith, noted along similar lines that an FCE would

not be helpful because Plaintiff could give a self-limited effort, particularly in light of her

history of somatization and conversion disorders.  Each of the physician consultants noted

that the FCE results were not supported by the results of other tests and examinations, and

resolved the conflict in favor of other reliable evidence.  Given the questionable reliability

1    of the FCE results, and in light of the contradictory evidence, MetLife did not abuse its

2    discretion in assigning the FCE lesser weight.

3         Finally, Plaintiff analogizes MetLife's conduct to that which the Ninth Circuit

4    disapproved in Saffon v. Wells Fargo & Co. Long Term Disability Plan, 511 F.3d 1206

5    (9th Cir. 2008).  (Pl.'s Reply 5:19-7:22.)  Several distinctions between Saffon and the

6    case at bar render Saffon inapposite.  First, Saffon was not made aware of MetLife's

7    request that her neurologist respond with supporting documentation if he disagreed with

8    the independent physician consultant's determination.  511 F.3d at 1212.  As a result,

9    Saffon "was not in a position to urge him to timely respond or ask MetLife to extend the

10   [response] deadline."  Id. at 1216 n.3.  In contrast, Plaintiff was notified of MetLife's

11   request for documents and records from her treating physicians, and was asked to contact

12   her physician's office to ensure the information was submitted.  (DSOF, Ex. 69, ML-

13   Booth 0360.)  Second, Saffon provided on appeal her most recent MRI, which evidenced

14   her pathology and showed that her spine was not significantly changed since an MRI

15   taken right after Saffon's car crash.  Saffon, 511 F.3d at 1213.  MetLife did not explain

16   why the MRI did not amount to "objective clinical information."  Id. at 1214.  In this

17   case, Plaintiff provided the FCE results, which did not evidence any pathology and was

18   less reliable than an MRI for reasons discussed above; the reasons for discounting the

19   FCE were provided, and Plaintiff's MRIs and other pathological tests did not support a

20   pathology requiring her not to work.  (See DRSOF, Ex. 81, ML-Booth 1029-1030.)

21   Third, in Saffon MetLife indicated that an FCE was necessary for it to evaluate Saffon's

22   clam, but added that as a new reason for denial in its final decision.  Saffon, 511 F.3d at

23   1215.  In contrast, the record in this case consistently shows that MetLife did not believe

24   an FCE would be helpful.  For these reasons, the Court finds that this case does not

25   compel the same result as Saffon.

26

1     MetLife did not abuse its discretion in lending greater credence to objective

2  examinations and test results.  Although MetLife's conclusion conflicted with the

3  opinions of Plaintiff's treating physicians, reliable evidence supported the conclusion that

4  Plaintiff could perform sedentary work duties.  As the Court may not "impose on plan

5  administrators a discrete burden of explanation when they credit reliable evidence that

6  conflicts a treating physician's evaluation," MetLife's decision cannot be said to be

7  clearly erroneous.  Id.  Similarly, it was within MetLife's discretion to give lesser weight

8  to the FCE based on the skepticism of Drs. Grattan, Robbie, and Babus that the FCE

9  reflected Plaintiff's true functional abilities, and conflicting evidence from other

10  examinations and tests.  Because MetLife's factual determination is not clearly erroneous,

11  the Court will not disturb its decision to terminate LTD benefits.  Jordan, 370 F.3d at 875.

12          **C.  MetLife's Requirement of "Objective Medical Evidence"**

13     MetLife terminated Plaintiff's benefits and upheld termination on appeal on the

14  grounds that Plaintiff failed to provide "objective medical evidence" that her disability

15  prevented her from returning to work.  Plaintiff asserts that MetLife abused its discretion

16  by requiring "objective medical evidence" of the conditions and symptoms causing her

17  disability.  (Dkt. 37, Pl.'s Cross-Mot. for Summ. J. 14:13-15:26.)  A claims administrator

18  abuses its discretion if its decision is based on an unreasonable interpretation of the plan's

19  terms.  See Bendixen, 185 F.3d at 944.  In this case, the Plan requiring objective medical

20  evidence is a reasonable interpretation of the Plan's terms.  The Plan reserves to MetLife

21  discretion to determine eligibility for benefits.  (See Dkt. 53, Second Supp. to Admin. R.,

22  ML-Booth 0944, 955.)  In making that determination, it is reasonable for MetLife to

23  request medical evidence that can be reviewed, beyond the claimants' subjective

24  reporting of their condition.  Therefore MetLife did not abuse its discretion in requiring

25  Plaintiff provide objective medical evidence.

26  //

**CONCLUSION**

For the reasons discussed above, the Court finds that MetLife did not abuse its discretion in terminating Plaintiff's LTD benefits.  Therefore, the Court will grant summary judgment in favor of Defendants.  Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 21) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Cross-Motion for Summary Judgment (Dkt. 37) is **DENIED.**  Plaintiff shall take nothing, and judgment shall be entered in favor of Defendants.

**IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment in favor of Defendants and terminate this action.

DATED this 28th day of March, 2008.

Stephen M. McNamee
United States District Judge